The next case on our docket is 2151039 Smith v. City of Bastrop Is it Milvenin? May it please the court, I'm Rick Milvenin and I'm here on behalf of Plaintiff Appellee's Carolyn Smith and Lurtex Properties, which were referred to as the property owners in the brief. In an era when trust in government in America is at historic lows, judges and attorneys have the privilege of enforcing the Constitution to remedy government misbehavior. In this case, it is undisputed that the City of Bastrop did not follow a statute enacted by the Texas Legislature to protect property owners living in public improvement districts or PIDs. The 2019 ordinance that's being challenged in this case says on its face municipal records prior to the fall of 2017 do not demonstrate statutory compliance in the operation of the district. At trial, Judge Pittman observed, quote, the City of Bastrop didn't care if it was compliant with the PIDA Act for a long time. I mean, they were negligent at best. And then once they realized they had a catastrophe, they tried of kind to cobble something together that was going to make it fly, right? I mean, does anybody disagree with that? Close quote. Nobody disagrees with that. For over 15 years, the city failed to comply with mandatory oversight procedures for the PID. Free from the city's oversight, a private developer incurred overruns that were beyond the city's 2003 estimate of capital construction costs. Counsel, as I understand it, no one attempted to mandamus the city into performing these? Was it like an annual assessment, annual audit of sorts? Yes, Your Honor. Let's talk about that because that's very important. This was kind of a red herring that the defendants threw into the case. Under the PIDA Act, there has to be annual reviews. And if those annual reviews don't happen, the cost overruns are waived. That's it. So no one on my side of the case had any reason to mandamus anyone because they weren't going to have to pay unless increases were approved. Where in the record do we find the clear statement that they are waived if those annual reviews aren't conducted? Is that part of the ordinance? No, it's part of the PIDA Act. Okay. And we prepared a chart because the PIDA Act is relatively long and showed in our opening brief that that is indeed the case. I have a question before you get back into that. Yes, please. You don't contest that your clients owe the original amount. It's the additional amounts that you're objecting to. Is that correct? That's absolutely correct, Your Honor. Our position is that the 2003 ordinance was properly enacted, that certain cost overruns occurred for the original developer. The original developer did not make any effort with the city to get those overruns approved, and they then sold their interests to another developer, TF, in this case. TF then lobbied the city to pass the 2019 ordinance, which dramatically increased what our clients were going to have to pay. And our position is that the 2019 ordinance should be enjoined as violative of the federal and Texas constitutions, and that if that occurs, what will then happen is the 2003 ordinance will remain in effect. Now, as I said, as soon as TF took over this, their receivables from the original developer, it demanded the city pay for cost construction overruns that have already been waived. At first the city fought back and said, no, we're not going to do that. But eventually the city rolled over and gave the developer what they wanted, which was more money from the PID property owners. Now, let's make one thing crystal clear, and it's in the briefs and nobody disputes it. From the beginning of this litigation, the city has made clear it owes nothing under the 2003 or 2019 ordinance. So you can't justify the 2019 ordinance on, well, the city was getting out of paying money. No, they didn't owe anything. So if this court invalidates the 2019 ordinance, the developer doesn't get a windfall and the city doesn't owe anything. Now, we have appealed from Judge Pittman's ruling, but he did make certain rulings that were correct. First, and importantly, he determined that between 2003 and 2019, the city of Bastrop failed to conduct the PID Act's mandatory annual review of the service and assessment plan. Second, he correctly determined that under the PID Act, PID property owners have constitutionally protected property interests. Third, in the analysis in his motion to dismiss, the district court observed he could have, quote, hypothesized no reasonable explanation or legitimate purpose for the city defendant's failure to conduct budgetary reviews, hold hearings, and hear objections on an annual basis before passing an ordinance to increase assessments as required by the PID Act. Now, where Judge Pittman got off track and made legal error was in his evaluation of the 2003 ordinance and the PID Act, and those are purely legal determinations. In the 2003 ordinance, the city of Bastrop estimated that there would be $7.5 million in capital construction costs. It also estimated that there would be $4.5 million in interest costs. It is undisputed that no interest was ever incurred. The PID Act does not permit cities to assess property owners for costs that were never incurred, and it's undisputed that the city did not make any borrowings to pay for project costs. In this case, the city of Bastrop's special legal counsel, George Hyde, who is in the courtroom and you're going to be hearing from him shortly, wrote and testified to this. He wrote that, quote, because there has been no borrowing, the PID costs have not been subject to interest at all and are not subject to interest until and unless there is a borrowing of PID debt to pay project costs. Therefore, this is a zero-interest PID. Now, it would be a strange constitutional result for this court if it allowed the city of Bastrop to charge property owners for fictitious interest that was never incurred. If that were the law, then the property owners could be assessed if the developer never did anything. I mean, because you're at that point saying, well, it doesn't matter whether if they estimated it, they get to collect it. That's what the city of Bastrop argues here. Second, even if there had been interest in this case, it couldn't be taxed to the property owners, and that's because the form of agreement between the city of Bastrop and the developer was a reimbursement agreement, and the PID Act specifically says what type of agreements will permit interest to be charged to property owners, and that isn't one of them. Again, that holding is an error of law. So would it have been possible for the city of Bastrop to raise the assessment from that $7.5 million for capital construction costs? Yes, and in our brief, we set forth that lengthy chart that shows how the city goes about having annual hearings. It is absolutely clear that if there are overruns, there has to be notice in hearing, and they have to be considered in the year they were incurred. It is undisputed that didn't happen here, and as a result, they couldn't ever charge more than $7.5 million in capital construction costs. It's also the case that the property owners put on an expert witness who testified, here is how much more money the plaintiffs, now appellants, are going to owe under the 2019 ordinance. The city's expert did not make any calculations as to what the plaintiffs were going to owe under either the 2003 or the 2019 ordinance. So there were three legal challenges that we made in this case. First, there was a substantive due process analysis, and as this court is well aware, that focuses heavily on legitimate government purpose. The 2019 ordinance was passed with an illegitimate goal, which was simply to benefit a private party, and this court has looked at cases before like that and said, if it's just to benefit a private party, it's not a legitimate government goal. That's like that semi-case that we cite in our brief. It is undisputed that the city commissioned an independent accounting firm to study the 2003 ordinance and the city's operation of the PID since 2003. That accounting firm refuted the developer's claims to millions of dollars in fictitious interest and unapproved cost overruns. It's also undisputed that the private developer who bought these receivables, TF, in concert with Mr. Hyde, drafted the 2019 ordinance. Now, incredibly, my friends on the other side don't see that as a bad fact for them. In post-trial briefing, the developer TF boasted that it successfully lobbied municipal officials in a concerted effort to sway the city of Bastrop to enact the 2019 ordinance. Again, benefiting a private party is not a legitimate goal, and so therefore it violates the substantive due process. We also make a procedural due process claim. This is relatively simple. In terms of procedural due process analysis, this court has to consider were the procedures that were used in drafting the 2019 ordinance constitutionally sufficient. In this case, the PETA Act specifies, that is the state legislature specifies, this is what you have to do if you want to increase from the 7.5 million capital construction costs that were assessed in 2003. You have to have annual reviews. The city has to make sure these overruns are justified. The city then decides, okay, we're going to adjust the assessment. That never happened, and it has to happen in the year those overruns occur. What is the result of that? By 2019, it was too late to follow the procedures that are mandated by the state of Texas. Therefore, no procedure could have happened in 2019 that would have avoided a procedural due process claim. And then our final theory is retroactive lawmaking under the Texas Constitution. It's prohibited. We've cited the Robinson case in our brief and the Zatari case in our brief. It's a three-part test in Texas. The Robinson test is, looks like I'm close to being out of time. The Robinson test is a three-part test. Substantive due process only requires a legitimate government interest. The Robinson test requires a compelling government interest. And as we just discussed, you know, helping out a private party at the expense of the public is not a compelling interest, and that was what Robinson found. As to the second part of the test under Robinson, it is the nature of the right impaired. Here, Judge Pittman found that there's a constitutional protected property right in having the PETA Act applied to the parties, the property owners. The third fact is the extent of the impairment, which, again, we've already talked about that. Our clients had to pay more. So where we are at this point in the process, we're asking the court to reverse the decision below. This appeal involves purely legal issues. It is looking at the 2003 ordinance, looking at the PETA Act, and looking at the 2019 ordinance. And interpretations of ordinances and statutes are questions of law. So we ask the court to render a judgment declaring that the 2019 ordinance violates the U.S. and Texas constitutions and enjoin its enforcement, we also ask for a remand, but only on the issue of attorneys' fees, which we would want to approve of. Mr. Hyde. Please, the court. First of all, I wanted to resolve some of the discussion that we've heard today, because, frankly, I find the interpretation of Chapter 372 by opposing counsel somewhat fictitious, because I can't find the language of which he states that's in it, and I think I just about know it by heart. But 372.013a says that an advisory body, which is a defined body under 372.008, shall prepare an ongoing service plan and present the plan to the governing body of the municipality or county for review and approval. Then it says the governing body may approve the plan. May, not shall, may. So there is no statutory requirement, ministerial obligation, on the city council to do so. But then it also says that the governing body may assign responsibility for the plan to another entity in the absence of an advisory body, and that's the case here. The city of Bastrop did not create an advisory body at the beginning of the PID, back in September 11, 2001, when this was approved. So they created a local government corporation called the Hunters Crossing Local Government Corporation as that substitute body. And that substitute body, including time periods where the owner was on the board of the Hunters Crossing Local Government Corporation, did reviews of the service plans. Where the organization is critical is that those did not get on an agenda for the city council to consider for approval. So the ministerial obligation under 031A did occur. The Hunters Crossing Local Government Corporation did review those plans. They just were not approved by the city council, which is a discretionary act on their part. And that's not the way it's done. In Texas, on a public improvement district, they're regularly approved by the city council. And so that was a flaw in understanding what this delegation, this assigned responsibility for the plan was. The city believed at that time that when they were able to assign the responsibility, it relieved the city council from an obligation because it assigned that responsibility to the third party. Instead of understanding that even though the service and review plan review was done by the body, it still had to come back to the city council for approval. So I want to make – because there isn't a conspiracy or some type of bad act on the part of the city of Bastrop to do something. They have no – there's no motive for any of that. It was just a misunderstanding. If I understood what you just said correctly, the reviews were done. They were just not submitted and approved and had – for open comment. Is that correct? Well, there were public hearings that were noticed for every one of those in the Hunters Crossing Local Government Corporation board meetings. Okay. That are also public meetings that are required under the Texas Open Meetings Act. It was just the actual final approval portion. I went through the agendas because I wasn't there in 2003 and 4 and 5, but I did not find an agenda that had the review of this on it. Putting aside whether they were done at some level and to what extent or to what degree, do you agree with council that if they were not done, period, that would constitute a waiver of any increases? Absolutely not. It doesn't exist. That's nonsensical. These PIDs sometimes are $50 million, $60 million, and they issue debt, public debt or private debt under the PID Act, and there are securities that are issued, bonds. If you could come in in the middle of a bond and waive $40 million out of the bond, your ripple effect is horrible, and it's also a huge windfall. These monies here, and this is why interest really doesn't matter, even though it's noted 27 times in the statute, is that the court ruled as a fact that over $14 million was spent by the developer to develop these improvements. The $11.961 million is on the face of the ordinance, and when I went to law school I was told I was supposed to look at the ordinance in order to interpret it and that that's not a question of law, and on the face of the ordinance it's very clear that $7.365 million was allocated to commercial, $4.397 million was allocated to single-family residential, and then the other one, the maintenance operation, was allocated at $5.4 million. When you add up the $7.365 and the $4.397, guess what? We're at $11,962,000. That is what that statute did. I write ordinances for 25 years. When that ordinance on the face of it says this is the assessment and then it shows the supporting work, which underlined their decision that that was the assessment, those issues are respectfully, you can't go into and cherry-pick one portion of this and say, oh, this is a subassessment and you didn't use this much money for this purpose when the overall levy was lump sum levy at the time in 2003 was $11,961,000 over 283 acres. Now, what 2019 does is it allocates a portion, that $11,961,000, to the properties as they were developed because just like the proposed plan in 2003, like they say, any plan in the world doesn't survive first contact, right, is that here, when they started developing it, they found out they needed much more land for drainage. Did I understand correctly in the briefing that your position that there was no interest involved in the new amount, the 2019, there was no interest involved, or do you agree with counsel that there was some interest that was associated with the developers' expenses? Well, first of all, and this is a lot of the back and forth, I was in a position representing the Hunters Crossing Local Government Corporation in order to try to review this PID and focus on the method by which to ensure that it was the lowest we could for the public. And during those arguments and the advocacy back and forth during the negotiations, I made a lot of assertions of which later on in the investigation may or may not have been valid. And so those are the comments of which you see the plaintiff trying to blame. As we sit here today, is there any interest in that total? And there was an intent to have interest on those costs, but it didn't matter. It became irrelevant because the developer— You said there was an intent to have— was there any interest as we sit here today, and you've had a chance to go through this both at the time with the district court and now in preparation for today, in the total 2019 amount, does that include any interest that the developer incurred? No, it does not. And the reason why is because the developer never asked for it. All of the developer's reimbursements were done based on hard costs. And so the over $14 million did not include any interest, whether there was any or not, because the record doesn't show that there was any interest. The other thing is the remedy. And, you know, Judge Inglehart, you brought it up first, but generally speaking, when there are obligations that are statutorily made without a remedy in them, then there is not a money penalty, which makes sense, especially since this is a bond issue and a funding issue, is that you seek mandatements to get it resolved. Well, my client in 2017 realized that there were concerns with regards to the interpretation of the PID and did self-help, hired me and had us go through it, get with the developer and find a means by doing so. And in so doing, we were able to reduce, by developer credit, over $2 million of debt for the over 500 residents that live in this PID. And if you were to invalidate this ordinance, there is no apportionment. So all of the property goes back to a joint and several liability under the 283-acre tract. And there's no $2 million reduction. And so all of those people will owe the developer another $2 million that they were able to credit through our negotiations to get this ordinance in place. So it's nonsensical right here, because by giving them the relief they're asking for, it's actually going to harm their clients. I'm confused here. Yes, ma'am. You say an additional $2 million. Is that in addition to the original 11-something? No. The 11-962 was the allocated levy. Through the negotiations and process of restating the reimbursement agreement and adopting the ordinance in 2019, the developer agreed to apply a developer credit of $2.1 million, reducing the debt, which was then about $9 million, because there had been $2.2 million of payments, to $7. So that was part of the concessions that I was able to acquire from the developer in the course of restating the service and assessment plan. And if they win, they're going to owe $2 million, and the whole property will not have been assessed. It would completely wipe out legislative discretion that was used to allocate those funds based on the benefit. And the reason why the commercial properties get a special and different amount is that because they did what are called regional drainage facilities, all of the commercial properties did not have to set aside real property to do their own drainage. Therefore, they could build another 1,000, 2,000, 3,000 square foot, depending on the size of the drainage that would have been necessary, of which they can make income every year forever. Contrast that to the residents. In the residents' situation, they don't have an income-producing process, and so having the drainage in a regional drainage did not have the same benefit to them. It was a lesser benefit. And those are the kind of reasonable decisions that a city council does as a legislator in adopting these ordinances. And that's what the materials that Exhibit E and Exhibit F and all of those attachments to the ordinance are. Those are there in order to avoid someone saying that you just made this number up. Instead, they had opinions of probable costs that were done by licensed engineers that supported the discretion of the city council so that making the $11.962 million levy was supported and not arbitrary or capricious. That's what that is. You can't go back into those, otherwise you're going to have these subassessments that say, okay, we spent more for drainage and less on roads, and so do we have a drainage line item and a road line item on the levy? No. The levy is $11.961, and the allocations are done by the legislative decision-making by the city council with regards to the specially-benefited property. So the whole approach is backward from the practice of public improvement districts for the last 20 years that the plaintiffs are taking. With regard to the 25-year period, and this is one thing that their expert admitted on cross-examination, is that the way this TID was designed initially was that when somebody bought property, the PID debt would start to be a repayment obligation. So the developer developed the property that was sold to a builder. The builder built a house, and then if you bought the house, that's when the PID debt started. And it had a staggering PID debt obligation based on when they bought the house. So with 514 homes plus about 30 different multi-family and commercial lots, that would have meant that there would be 570 different timelines as to when you make your first payment, your second payment, depending on when you bought the home or bought the property. And that was what we found unworkable. And also it did not... 25 years based on the allocations that were shown in the original service and assessment plan, the installments, would not have completely paid off the debt. So that's part of what we did when we restated it, is we put it in in a statutory compliant way to allocate those funds so that any one property owner didn't have a joint and several liability, but they had their own unique liability of which they could pay off or continue to pay. Because of the no interest negotiation, like the $2 million, that there would be no further interest considered where there was interest referred to in the 2003 service and assessment plan, that even reduced the overall debt more. And so that's the other part, that they would have an interest obligation under the original service and assessment plan, but they do not have an interest obligation under the one that was passed in 2019. The other part that is really difficult in order for substantive and procedural due process is that there has to be a damage. And here the only thing that would occur, if this was invalidated somehow, would be a windfall to the residents and that they didn't have to pay for the water, the drainage, the roads, the trails, all of the infrastructure that money was provided to that increased the value of their property. And that would be an injustice. With regard to procedural due process, the city was abundantly clear with that. It shows in the record that we had a town hall meeting and I sat there and discussed all of the potential changes to the PID and explained it. There was about 80 or 90 people that came. Then we had public hearings that were advertised in the newspaper twice before the city council, which are not required in the normal process of amending a service and assessment plan. And so from a procedural due process and attorneys for the plaintiffs actually came and spoke at those meetings. So not only was there public notice, there was also public available to comment. And so from a procedural due process standpoint, there's just nothing in the record that would support such a claim. I think that Judge Pittman had it right when he looked at the case and he said in 2003, a single lump sum levy in accordance with 372 was placed on a single track of 283 acres in the amount of $11,961,000. In 2019, the amount that was, there was no change to that levy. There was only one levy. Now it was allocated and apportioned, but there was never another levy installed. So there could not be any more money owed by the people that lived in the district. It was just how that allocation was done in order to ensure that each person had the ability to pay off their own loan. Without any other questions, I'll give you back a couple minutes. Thank you. Judge Englehart, you asked a question of opposing counsel about interest. Let's make this clear because it's somewhat of a math problem, even though no one said we were going to have to do math. 2003, $7.5 million in capital construction costs estimated, $4.5 million in interest costs estimated. No interest was ever incurred, not from then all the way to the present. 2019, they don't even estimate any interest because they know there's not going to be any interest associated with this PID. So what happened was the estimate of capital construction costs of $7.5 million in 2003 was now $11.9 million in 2019. So it went up. That's how we were harmed. Now, there was a little doublespeak there about this local government corporation. That doesn't fly at all. First of all, there's no record evidence because it never happened. The local government corporation did not approve actual increases. And the statute itself, the PETA Act, says in 372.013 that it's the governing body of the municipality that has to make these determinations. And it's surprising that they would make this argument to this court because at trial there was a stipulation that the city did not at any time from 2005 to August 2019 update or amend the 2003 ordinance or adopt a new ordinance governing the PID to include capital improvement expenditures incurred or spent by the PID developer from 2005 to 2018. They stipulated to that. Now, there is one confusing sentence that should be mentioned from the district court's opinion, but it's on this very point. On page 11 of the district court's ruling, it says, PETA states that the service plan must be reviewed and updated annually for the purpose of determining annual budget for improvements. Plaintiffs did not conduct these annual reviews until 2019. Obviously, Judge Pittman meant defendants. The plaintiffs had no obligation under the PETA Act to conduct these reviews. So where are we on this in terms of the relief we're seeking to remedy the wrongdoing that happened to our clients that's costing our clients money now? And the court asked, well, you know, obviously the capital construction costs are much higher in 2019 than they were in the 2003 ordinance, but it's also the case that the PID was extended out to later dates. Our clients are going to have to pay operation and maintenance expenses all the way to 2040. But you've got this story about, well, we had to do this in 2019 to apportion. That's simply not true. First, there are extensive formulas in the 2003 ordinance for assigning how much each property would end up having to pay. Second, the city's CFO, Tracy Waldron, testified at trial that the city actually collected PID assessments in accordance with what the formulas were in the 2003 ordinance. So this notion, well, we had to apportion it. And then, you know, they have this theory that... How about the number of houses? There were more homes built than were originally contemplated in the 2003 ordinance. I haven't read this. No. The issue is there were formulas for how you would, in the 2003 ordinance, which the court has in the record, this is how you calculate it out for any individual house. And what Tracy Waldron said is, yeah, we applied those very formulas from the 2003 ordinance. So the other argument they make is, oh, but there was an $11.9 million lien on every property in the PID. That makes no sense. It's not true. No one would have ever bought a house in a PID that was subject to an $11.9 million lien. And I even asked the plaintiff's expert, hey, would you have bought a house in there if it was subject to an $11.9 million lien? Of course he said no. But the court needs to think about what the consequences are for this because in terms of the way PIDs will be implemented going forward, developers are going to rip off property owners, and we're going to see more and more of this. This vehicle is being used more and more by municipalities, and this court needs to stand in and correct this. Thank you. We have your argument. The court will take a brief recess.